IN THE SUPREME COURT OF THE STATE OF DELAWARE

JASON TERRELL §
§
Plaintiff Below, §    No. 131, 2024
Appellant, §
§    Court Below: Court of Chancery
v. §    of the State of Delaware
§
KIROMIC BIOPHARMA, INC., §
a Delaware corporation, §
§    C.A. No. 2021-0248
§
Defendant Below, §
Appellee. §

Submitted: October 30, 2024
Decided: January 21, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, and **LEGROW**, Justices.

Upon appeal from the Court of Chancery and the Superior Court of the State of Delaware. **REVERSED.**

Scott James Leonhardt, Esquire, THE ROSNER LAW GROUP LLC, Wilmington, Delaware, Alexander Klein, Esquire (*argued*), Donna Aldea, Esquire, BARKET EPSTEIN KEARON ALDEA & LOTURCO, LLP, Garden City, New York, *Attorneys for Plaintiff Below, Appellant Jason Terrell.*

Laurence V. Cronin, Esquire, Kelly A. Green, Esquire, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware, Robert S. Friedman, Esquire, Joshua Schlenger, Esquire (*argued*), Katherine Anne Boy Skipsey, Esquire, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, New York, New York, *Attorneys for Defendant Below, Appellee Kiromic Biopharma, Inc.*

**LEGROW**, Justice:

Kiromic Biopharma, Inc. awarded Jason Terrell stock options in three separate agreements over the course of several years. The first option award compensated Terrell for consulting services he provided to the company. The latter two awards were related to Terrell's service on the company's board of directors. After Terrell resigned from the board, the company refused to honor the options awarded in the first two agreements, taking the position that Terrell waived his rights to those options when he entered into the third agreement.

The Court of Chancery dismissed Terrell's complaint that sought specific performance of the first two option grants, finding that a waiver clause in the third agreement unambiguously extinguished Terrell's rights to the two previous option awards. We find that the waiver language is susceptible to more than one reasonable interpretation, and we therefore reverse the Court of Chancery's dismissal of the complaint and remand for further proceedings.

## I.    FACTUAL BACKGROUND

The appellant, Jason Terrell, M.D., performed consulting services and served on the board of directors of the appellee, Kiromic Biopharma, Inc., between December 2014 and May 2021.[1] During that time period, Kiromic awarded Terrell stock options in three separate agreements. The first agreement ("Agreement 1"), a "Consulting Agreement," was entered into on December 10, 2014, and granted

---

[1] The facts are drawn from Plaintiff's Verified Complaint. App. to Opening Br. at A13–24.

Terrell an option to purchase 500,000 Kiromic shares at a fixed price of $0.50 per share in exchange for consulting services.[2]  The second agreement ("Agreement 2"), a "Non-Employee Director Agreement," was entered into on January 23, 2017, when Terrell joined Kiromic's board, and it granted him the option to purchase 500,004 shares at $0.17 per share.[3]

On November 10, 2017, Terrell and Kiromic entered into a "Notice of Stock Option Grant" ("Agreement 3"), under which Terrell agreed to continue serving on the board in exchange for the option to purchase 500,004 shares at $0.19 cents per share.[4]  Agreement 3 incorporated a Stock Option Agreement (the "SOA"), which was Exhibit A to Agreement 3, and Kiromic's 2017 Equity Incentive Plan, which the SOA incorporated by reference.[5]

Terrell resigned from Kiromic's board in September 2019.[6]  After Terrell resigned, Kiromic refused to recognize the options granted in Agreements 1 and 2. Terrell therefore brought an action in the Court of Chancery seeking a declaration that Agreements 1 and 2 were valid and enforceable and seeking specific

---

[2] *See id.* at A15.  The term to exercise this option was scheduled to expire on December 10, 2024. *Id*. at A26–30 (Agreement 1).

[3] *Id.* at A16.  The term to exercise this option was scheduled to expire on January 23, 2027.  *Id*. at A34–35 (Agreement 2).

[4] *Id.* at A17. The term to exercise this option was scheduled to expire on November 9, 2027.  *Id.* at A15, A37–69 (Agreement 3).

[5] *Id.* at A37–38 (Agreement 3); A40–53 (SOA); A54–69 (Equity Incentive Plan).

[6] *Id.* at A17.

performance of those agreements.[7]  Kiromic moved to dismiss that claim, arguing that Terrell waived his rights to the unexercised options granted to him in Agreements 1 and 2.[8]  Kiromic based its waiver argument on a provision in Agreement 3 (the "Waiver"), which provides:

> By signing this Grant Notice, you acknowledge and agree that other than the Shares, you have no other rights to any other options, equity awards or other securities of the Company (except securities of the Company, if any, issued to you on or prior to the date hereof, if any), notwithstanding any commitment or communication regarding options, equity awards or other securities of the Company made prior to the date hereof, whether written or oral, including any reference to the contrary that may be set forth in your offer letter, consultant agreement or other documentation with the Company or any of its predecessors.[9]

The Waiver can be separated into three clauses: the "No-Rights Clause,"[10] which generally waives all of the grantee's rights to Kiromic securities other than the Agreement 3 option; the parenthetical "Carveout,"[11] which preserves from the waiver any "securities . . . issued" before Agreement 3 was executed; and the

---

[7] *Id.* at A13–24 (Complaint).

[8] *Id.* at A102–27 (Mot. To Dismiss).

[9] *Id.* at A38.

[10] "By signing this Grant Notice, you acknowledge and agree that other than the Shares, you have no other rights to any other options, equity awards or other securities of the Company . . . ." *Id.*

[11] "([E]xcept securities of the Company, if any, issued to you on or prior to the date hereof, if any) . . . ." *Id.*

"Notwithstanding Clause," which reiterates that the waiver applies notwithstanding other commitments or communications.[12]

Terrell's claims have a tortured procedural history. Terrell filed his complaint in March 2021, and Kiromic moved to dismiss it on the basis of what Kiromic argued was the Waiver's unambiguous effect.[13] The Court of Chancery asked the parties to brief whether a dispute-resolution provision in the SOA required disputes regarding the Agreement's interpretation to be submitted to a Kiromic committee (the "Committee") before they could be challenged in litigation.[14] The parties briefed the issue,[15] and on January 20, 2022, the court held that the Committee must determine in the first instance whether it had jurisdiction over the parties' dispute regarding the Waiver's interpretation.[16] The court instructed the parties to submit their dispute to the Committee if it concluded that it had jurisdiction.[17]

The Committee ultimately determined that it had exclusive authority to interpret Agreement 3 and that the Waiver extinguished Terrell's options granted by

---

[12] "[N]otwithstanding any commitment or communication regarding options, equity awards or other securities of the Company made prior to the date hereof, whether written or oral, including any reference to the contrary that may be set forth in your offer letter, consultant agreement or other documentation with the Company or any of its predecessors." *Id.*

[13] *Id.* at A13–24 (Complaint), A102–27 (Mot. to Dismiss).

[14] *Id.* at A221, *see generally* A191–222 (Tr. of Oral Argument on Mot. to Dismiss).

[15] *Id.* at A162–67 (Terrell's Suppl. Br. on Section 15.1), A168–73 (Kiromic's Suppl. Br. on Section 15.1).

[16] *Terrell v. Kiromic Biopharma, Inc.*, 2022 WL 175858 (Del. Ch. Jan. 20, 2022).

[17] *Id.* at *7.

4

Agreements 1 and 2.[18] The Court of Chancery then issued an order on August 2, 2022, dismissing Terrell's claims for lack of subject matter jurisdiction.[19] Terrell appealed that decision, arguing that the Court of Chancery was required to conduct its own review of the Committee's interpretation.[20] This Court reversed the dismissal on the basis that the Court of Chancery should have reviewed the Committee's conclusion *de novo*.[21]

On remand, after allowing the parties to make further submissions, the Court of Chancery reviewed Agreement 3 *de novo* and held that Terrell waived his rights to the unexercised options awarded to him in Agreements 1 and 2.[22] The Court of Chancery found that the language in the Waiver's No-Rights Clause stating that "you acknowledge and agree you have . . . no other rights to any other options, equity awards or other securities of the Company" unambiguously constituted an express waiver of Terrell's unexercised options in Agreement 1 and 2, and that the Carveout excepting from the waiver "securities of the Company, if any, issued to [Terrell] on or prior to the date hereof, if any" did not preserve the unexercised options.[23] In

---

[18] App. to Opening Br. at A223–227 (Committee Decision).

[19] *Terrell v. Kiromic Biopharma, Inc.*, 2022 WL 3083229 (Del. Ch. Aug. 2, 2022).

[20] App. to Opening Br. at A230–231 (Notice of Appeal).

[21] *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 614 (Del. 2023).

[22] *Terrell v. Kiromic Biopharma, Inc.*, 2024 WL 370040, at *3–8 (Del. Ch. Jan. 31, 2024) (hereafter "Opinion").

[23] *Id.*

reaching that conclusion, the Court of Chancery reasoned that the parties used the word "issued" within the agreement only when referring to shares; of all the thirty-five times in Agreement 3 when the verb "issued" and its derivatives were used, it referred to shares and not options.[24] Additionally, in many places, Agreement 3 used the word "grant" instead of "issued" to refer to options.[25] Finally, the court noted that "[t]he definitions of 'Shares' and 'Exercise Price' both include the word 'issuable;' the definition of 'Option' does not."[26] Considering Agreement 3's language describing the delivery of options as compared to shares, the court held that "shares are 'issued' while options are 'granted.'"[27]

Terrell filed a timely appeal of that decision, arguing that the Court of Chancery erred in its interpretation of the Waiver.[28]

## II. STANDARD OF REVIEW

We review questions of contract interpretation *de novo*.[29]

---

[24] *Id.* at *7.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] App. to Opening Br. at A230–231 (Notice of Appeal); *see* Opening Br.

[29] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014); *Kuhn Const. Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010).

## III. ANALYSIS

Terrell argues that the Court of Chancery erred in holding that the Waiver unambiguously eliminated the unexercised options awarded in Agreements 1 and 2.[30] Terrell posits that Agreement 3—including the Waiver—unambiguously included options within the meaning of "securities," and the plain meaning of the Carveout, which preserved "securities . . . issued," therefore expressly protected the previously granted options.[31] He also contends that even if the Carveout's plain meaning did not expressly preserve those options, the language was ambiguous and his claim therefore should not have been dismissed at the pleadings stage before the court could consider extrinsic evidence to resolve the ambiguity.[32]

Kiromic urges us to affirm the Court of Chancery's dismissal because the Waiver expressly states that Terrell would "have no other rights to any other options . . . notwithstanding any commitment or communication regarding options."[33] Kiromic contends that the Court of Chancery correctly held that the Carveout's reference to "securities . . . issued" did not preserve unexercised options

---

[30] Opening Br. at 2, 10–23.

[31] *Id.* at 12–15.

[32] *Id.* at 19–23.

[33] Answering Br. at 17; Opinion at *5–6.

because the parties, in the four corners of the agreement, did not intend for unexercised options to be included in "issued" securities.[34]

In construing a contract, we aim to give effect to the parties' intent.[35] "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[36] This Court "will give priority to the parties' intentions as reflected in the four corners of the agreement."[37] "When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions unless it appears the parties intended a special meaning."[38] "Language is ambiguous if it is susceptible to more than one reasonable interpretation."[39] "An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person

---

[34] Answering Br. at 24–28.

[35] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023) (citing *Salamone*, 106 A.3d at 368).

[36] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)); *AT&T Corp. v. Lillis*, 953 A.2d 241, 252–53 (Del. 2008).

[37] *Salamone*, 106 A.3d at 368 (citing and quoting *GMG Capital Inv., LLC. v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[38] *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006); *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *10 (Del. Ch. July 6, 2018); *see also* Restatement (Second) of Contracts § 203(b) (1981) ("express terms are given greater weight than course of performance, course of dealing, and usage of trade . . . ."); *see generally*, Williston on Contracts § 34:5 (4th ed.) ("Courts will generally accept the definition employed in the relevant industry unless those terms are legislatively or judicially defined. Moreover, if words in a contract have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way . . . .").

[39] *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021).

would have accepted when entering the contract.'"[40] "The parties' steadfast disagreement over the interpretation of disputed language will not, alone, render the contract ambiguous."[41]

This appeal turns on the Carveout's meaning. More specifically, Terrell's appeal asks us to determine that the Carveout's reference to "issued" securities includes the options granted in Agreements 1 and 2. Kiromic concedes that "of course" the plain meaning of securities includes options under the parties' usage,[42] but urges us to affirm the Court of Chancery's finding that by referring to "issued" securities, the parties intended to exclude unexercised options from the Carveout. The only issue presently before us is whether a reasonable person in the parties' position would understand the Carveout's reference to "securities . . . issued" to include the options granted to Terrell in Agreements 1 and 2.

In concluding that the parties unambiguously intended the Carveout to apply only to preserve "issued" securities, and that they did not intend "issued" securities to include granted-but-unexercised options, the Court of Chancery considered how the parties used "issued" or its derivatives throughout Agreement 3 and the documents it incorporated, including the SOA and the Equity Incentive Plan.[43] The

---

[40] *Id.* (quoting *Osborn*, 991 A.2d at 1160).

[41] *Id.*

[42] Answering Br. at 24.

[43] Opinion at *7.

9

court noted several instances in which the word "grant" was used alongside options, while the word "issued" was used with respect to shares.[44] The court then concluded that if the parties had "intended for the Carveout to include grants and not just issuances, they would have included the word 'granted,' as they did other times when 'grant and issuance' were to be construed together."[45]

The Court of Chancery's holding—that the parties' usage of the verb "to issue" and its related nouns indicate an intent to exclude unexercised options from the Carveout—is a reasonable interpretation. Although Terrell points to sources outside the agreement's four corners that provide that "issued" or similar derivatives can include options, this Court gives priority to usage within the agreement itself.[46]

But we cannot conclude that Kiromic's interpretation is the only reasonable reading of the Waiver or the Carveout. From a practical perspective, it is difficult to understand why a reasonable person in the parties' position would rely on fairly obtuse language that turns on the meaning of the word "issued" to affect a waiver of options to purchase one million shares. Had the parties intended such a waiver, they could have said so much more clearly, including by expressly referencing the previously awarded options. Had they intended to limit the Carveout to shares rather

---

[44] *Id.* at nn.58–64.

[45] *Id.* at *8.

[46] *See Salamone*, 106 A.3d at 368 (citing and quoting *GMG Capital Inv., LLC.*, 36 A.3d at 779).

10

than a broader class of securities, the parties also could have expressly done so. And although the Court of Chancery concluded that the third agreement "never uses the word 'issued' in relation to options," Terrell has pointed to at least two instances in the SOA and the Equity Incentive Plan in which the parties used "issuance" and "issue" to refer to something other than just shares, including one instance in which the word "issue" includes options.[47]

Because the parties did not use the word "issued" to refer exclusively to shares, and because the Carveout expressly preserved securities—which included options under the parties' usage—Terrell's interpretation of the Waiver and the Carveout is also a reasonable one. Under that interpretation, the Waiver applies to previous commitments or communications regarding securities, while the Carveout preserves securities that have been formally issued, as opposed to just promised. This is particularly so because the parties used the phrase "securities . . . issued," rather than "shares issued," and they plainly intended the word "securities" to include options. If the parties intended to limit the Carveout to just shares, rather than securities, they easily could have said so, as they did numerous times in other

---

[47] "[T]he grant of the Option, the issuance of Shares . . . or any other issuance of securities under the plan." App. to Opening Br. at A43 (Section 7.1(d)). Section 9.3 gives the Committee the authority to "issue new Awards," and "Awards" include "any Option." *Id.* at A61 (Section 9.3), A67 (definition of Award).

11

portions of their agreement.[48]  And although Kiromic argues otherwise, Terrell's interpretation does not render the Notwithstanding Clause meaningless.  Under Terrell's interpretation, that clause clarifies the parties' distinction between securities formally issued by contract and informal promises made in written or oral commitments and communications.

Because we find that both parties have proffered reasonable interpretations of the Waiver, the agreement is ambiguous.  The trial court cannot choose between two reasonable interpretations of an ambiguous contract in resolving a motion to dismiss.[49]  Dismissal is proper only if the moving party's interpretation is the only reasonable construction as a matter of law.  Having concluded that Kiromic's interpretation is not the sole reasonable construction of the Waiver, we hold that Terrell's complaint adequately states a claim for relief.

## IV.  CONCLUSION

Accordingly, we REVERSE the judgment below and REMAND for further proceedings consistent with this decision.  Jurisdiction is not retained.

---

[48] The Court of Chancery noted thirty-five times where "issued" or its derivative was used with "Shares" alone.  Opinion at *7; *see e.g.*, App. to Opening Br. at A54, A60.

[49] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003).