**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

June 9, 2025

David E. Wilks, Esquire
Scott B. Czerwonka, Esquire
Wilks Law LLC
4250 Lancaster Pike
Wilmington, Delaware 19805

Richard L. Renck, Esquire
Michael B. Gonen, Esquire
Duane Morris LLP
1201 North Market Street
Wilmington, Delaware 19801

RE: *Techno-X USA Inc. v. Spartan Forge LLC et al.*,
C.A. No. 2024-1313-LWW

Dear Counsel:

This letter opinion addresses cross-motions for partial summary judgment. The motions present two threshold issues that center on two contracts. Although one contract's meaning is tangled in a choice-of-law snarl, the plain terms of the other contract support the plaintiff's reading under Delaware law. A portion of the first issue and the entirety of the second issue are resolved in the plaintiff's favor.

I.   BACKGROUND

Recounted below are the facts pertinent to the present motions. Unless otherwise noted, this background is drawn from the undisputed allegations in the pleadings and exhibits the parties submitted.[1]

---

[1] *See* Verified Am. Compl. (Dkt. 24) ("Compl."); Def. Spartan Forge LLC's Answer, Affirmative Defenses and Countercl. to Pl.'s Compl. (Dkt. 21); Pl. and Countercl. Def.'s

## A.    The Term Sheet

Plaintiff and counterclaim-defendant Techno-X USA Inc. is a Delaware corporation and wholly owned subsidiary of Vosker Corporation—a Canadian entity headquartered in Québec.[2]  Vosker provides surveillance solutions in the hunting and wildlife industry.[3]

In 2023, Vosker—through Techno-X—invested in defendant and counterclaim-plaintiff Spartan Forge LLC.[4]  Spartan Forge is a Delaware limited liability company that develops mobile applications for the hunting and wildlife industry.[5]  The terms of Techno-X's investment were memorialized in the Updated Binding Term Sheet dated March 8, 2024 (the "Term Sheet").[6]  The Term Sheet was executed by Techno-X, Spartan Forge, and each of Spartan Forge's four members.[7]

Reply and Affirmative Defenses to Spartan Forge LLC's Countercl. and Third-Party Verified Compl. (Dkt. 34); Defs. Spartan Forge and William Thompson's Answer and Affirmative Defenses to the Am. Compl. (Dkt. 35) ("Answer").  Exhibits to the defendants' and plaintiff's briefs are cited as "Defs.' Ex. __" and "Pl.'s Ex. __," respectively.

[2] Compl. ¶ 5; Answer ¶ 5.

[3] Compl. ¶ 12; *see* Answer ¶ 12.

[4] Compl. ¶ 15.

[5] *Id.*

[6] Defs.' Ex. A ("Term Sheet"); Pl.'s Ex. A (same).

[7] Term Sheet 7-8.

It contemplated that Techno-X would "acquire a significant portion of [Spartan Forge] in preferred interests" for cash.[8]

The Term Sheet labels some provisions "binding" and others "non-binding."[9] One of the "binding" provisions is called "Exclusivity; Restriction on Business."[10] It states that, for twelve months after Spartan Forge's acceptance of the Term Sheet, neither Spartan Forge nor its members would take certain actions without "the prior consent of [Techno-X]."[11]

### B.    The LLC Agreement

After the Term Sheet was signed, the parties negotiated an amended limited liability company agreement to govern Spartan Forge.  The Second Amended and Restated Operating Agreement of Spartan Forge, LLC (the "LLC Agreement") was executed on April 25, 2024.[12]  It was signed by Spartan Forge's original four members and Techno-X as a new member of Spartan Forge.[13]

---

[8] *Id.* at 1.

[9] *Id.* at 6.

[10] *Id.* at 4.

[11] *Id.*

[12] Defs.' Ex. B ("LLC Agreement"); Pl.'s Ex. B (same).

[13] LLC Agreement, Signature Page; *see* Compl. ¶ 16; Answer ¶ 16.

Section 8 of the LLC Agreement addresses the management of and decision-making over Spartan Forge's affairs.[14]  Section 8.1(a) gives managerial authority to a Managing Member.[15]  The Managing Member's authority is limited by a "Major Decisions" carve-out in Section 8.2(a), which lists actions the Managing Member cannot take without the prior consent of "(i) a Majority in Interest of the Members and (ii) the Board [of Spartan Forge]."[16]

Section 8.2(b) of the LLC Agreement lists additional major decisions the Managing Member cannot take without specific approvals.  It states that "except as otherwise provided in th[e] [LLC] Agreement," certain major decisions required "the consent of (i) a Majority in Interest of the Members; (ii) the Board; *and* (iii) [Techno-X]."[17]  The major decisions requiring these approvals include:

> (i) Any material change in [Spartan Forge's business]; . . .
>
> (iv) Any transaction by [Spartan Forge] to merge or consolidate with another person or entity; [and] . . .

---

[14] *See* LLC Agreement § 8 (discussing "Management and Operations").

[15] *Id.* § 8.1(a); *see also id.* § 8.6; *infra* notes 87, 97 and accompanying text (quoting these provisions).

[16] LLC Agreement § 8.2(a).  A "Majority in Interest of the Members" means the members of Spartan Forge holding more than 50% of the company's total units.  *Id.* § 1 (defining "Majority in Interest of the Members").  Spartan Forge's Board has three members.  One is designated by Techno-X, and the other two are Spartan Forge's cofounders.  *Id.* § 8.4(a); *see* Compl. ¶ 25.  The Board "advise[s] and oversee[s] the Managing Member in his exercise of the management of [Spartan Forge]."  LLC Agreement § 8.4(b).

[17] LLC Agreement § 8.2(b) (emphasis added).

(vii) Amend[ing] [Spartan Forge's] Certificate [of Formation] or th[e] [LLC] Agreement, except as otherwise expressly provided in th[e] [LLC] Agreement.[18]

## C. The December 17 Board Meeting

This suit was triggered by a December 17, 2024 Spartan Forge Board meeting where Techno-X learned about a potential transaction with defendant Plastic Research and Development Corporation ("PRADCO").[19]

The day after that meeting, Techno-X sued Spartan Forge and PRADCO. It alleged that Spartan Forge had presented the Board with an agreement "for the sale of substantially all Spartan Forge's assets" to PRADCO, in derogation of Techno-X's contract rights.[20] Techno-X filed the operative amended Complaint on January 3, 2025, adding as a defendant Spartan Forge's Managing Member William J. Thompson.[21] Techno-X claimed that Spartan Forge breached both the Term Sheet and LLC Agreement by negotiating a sale of assets to PRADCO without securing

---

[18] *Id.*

[19] Compl. ¶¶ 27-29; Answer ¶¶ 27-28.

[20] Verified Compl. (Dkt. 1) ¶ 1. Techno-X also sought a temporary restraining order to prevent Spartan Forge from having discussions with PRADCO. Just before an emergency hearing, PRADCO disavowed any negotiations with Spartan Forge, mooting the motion. *See* Dkt. 5, Ex. A; Dkt. 9.

[21] *See* Dkt. 24.

the requisite consents.[22] The parties agreed to expedite certain of Techno-X's claims and one of Spartan Forge's counterclaims.[23]

### D. The February 11 Member Meeting

While the parties were in the midst of expedited discovery, on February 5, 2025, Thompson scheduled a meeting of Spartan Forge's members for several days later.[24] A meeting notice stated that the purpose was "to discuss the status of the pending litigation and the ongoing operation and management of Spartan Forge."[25] An hour before the meeting was set to start, the members received two proposals to be voted on.[26]

The first proposal was to amend certain sections of the LLC Agreement, including the major decisions clauses in Sections 8.2(a) and 8.2(b).[27] The second proposal was "to confirm and ratify the Managing Member's authority to negotiate with PRADCO."[28]

---

[22] Compl. ¶ 37; *see supra* notes 17-18 and accompanying text.

[23] Dkt. 32.

[24] Defs.' Ex. D at 2; LLC Agreement § 8.3(b).

[25] Defs.' Ex. F.

[26] *See* Defs.' Ex. G. The cover email sending the proposals stated that they had been "attached in an update to the meeting notice." *Id.* at 1. The updated meeting notice in the record does not reflect any attachments. *See* Defs.' Ex. F.

[27] Defs.' Ex. G. at 2-3; *see supra* notes 16-18 and accompanying text.

[28] Defs.' Ex. G at 4.

Spartan Forge represents that both proposals were debated and considered at the February 11 meeting.[29] The proposals were approved by all members represented at the meeting—other than Techno-X, which abstained.[30]

### E. The Partial Summary Judgment Request

Immediately after the February 11 member meeting, Spartan Forge and Thompson (referred to together as "Spartan Forge") sought leave to move for summary judgment. They argued that decisions made at the February 11 member meeting nullified Techno-X's breach of contract claims.[31] After a round of expedited briefing on Techno-X's motion for a temporary restraining order, the parties joined issue on Spartan Forge's request for a pre-trial disposition of certain threshold legal issues.[32] I granted the parties' request for leave to file partial summary judgment motions on those issues.[33]

---

[29] *See* Defs. Spartan Forge LLC and William J. Thompson's Opening Br. in Supp. of Mot. for Summ. J. (Dkt. 80) ("Defs.' Opening Br.") 8 (citing Defs.' Ex. H).

[30] Defs.' Ex. H at 1, 6.

[31] Dkt. 56. Both Spartan Forge and Thompson are named as defendants. *See supra* note 21 and accompanying text. Because they have advanced a joint defense, I refer to them collectively as "Spartan Forge" for the sake of simplicity.

[32] Dkt. 72.

[33] Dkt. 73.

Expedited briefing on cross-motions for summary judgment followed.[34] The motions were taken under advisement on the papers as of March 12.[35]

On April 23, I sent a letter to the parties' counsel raising that the Term Sheet has a Québec choice of law provision.[36] This issue was not raised by either party. I therefore requested supplemental submissions on how, if it all, the choice of law provision affects their summary judgment arguments.[37] The final supplemental submission was filed on May 2.[38]

## II.    ANALYSIS

The parties' motions present two legal issues. The first issue is whether the LLC Agreement extinguished the "binding" provisions of the Term Sheet.[39] The second issue is whether the LLC Agreement was properly amended by actions taken at the February 11 member meeting.[40]

---

[34] *See* Pl.'s Opening Br. Regarding Threshold Issues of Law (Dkt. 81) ("Pl.'s Opening Br."); Defs.' Opening Br.; Defs. Spartan Forge LLC and William J. Thompson's Answering Br. in Supp. of the Cross-Mot. for Summ. J. (Dkt. 89) ("Defs.' Answering Br."); Pl.'s Answering Br. Regarding Threshold Issues of Law (Dkt. 90) ("Pl.'s Answering Br.").

[35] Dkt. 93.

[36] Dkt. 117.

[37] Defs. Spartan Forge LLC and William J. Thompson's Suppl. Br. on the Law of Québec (Dkt. 118) ("Defs.' Suppl. Br."); Pl.'s Suppl. Br. in Response to the Court's April 23, 2025 Letter to Counsel (Dkt. 122) ("Pl.'s Suppl. Br.").

[38] Dkt. 122.

[39] *See* Dkt. 72.

[40] *Id.*

Summary judgment is available under Court of Chancery Rule 56 where "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law."[41] "[T]he facts must be viewed in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that there is no material question of fact."[42]

"[P]ure matters of contractual interpretation a[re] readily amenable to summary judgment[.]"[43] "In cases involving questions of contract interpretation, . . . courts will grant summary judgment in two scenarios: (1) when the contract is unambiguous, or (2) when the extrinsic evidence fails to create a triable issue of material fact."[44] Here, a portion of the first issue presented and the entirety of the second issue can be resolved based on the LLC Agreement's terms.

### A. Principles of Contract Interpretation

The LLC Agreement is governed by Delaware law.[45] "Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should

---

[41] Ct. Ch. R. 56.

[42] *Senior Tour Players 207 Mgmt. Co. v. Golftown 207 Hldgs. Co.*, 853 A.2d 124, 126 (Del. Ch. 2004).

[43] *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *5 (Del. Ch. Nov. 19, 2013) (citation omitted).

[44] *Julius v. Accurus Aerospace Corp.*, 2019 WL 5681610, at *7 (Del. Ch. Oct. 31, 2019), *aff'd*, 241 A.3d 220 (Del. 2020).

[45] LLC Agreement § 11.2.

be that which would be understood by an objective, reasonable third party."[46]

"When interpreting a contract, [the] Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement.'"[47] The court must construe the contract "as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage."[48] Delaware courts will not look beyond the four corners of an unambiguous contract.[49]

The Term Sheet's choice of law provision selects the "laws of the Province of Québec."[50] Unlike Delaware, Québec civil law adheres to the "principle of consensualism."[51] Under that principle, "a contract is distinct from its physical medium."[52] That is, Québec recognizes "a distinction between the *negotium*, which

---

[46] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[47] *Id.* at 368 (quoting *GMG Cap. Inv., LLC. v. Athenian Venture P'rs I*, 36 A.3d 776, 779 (Del. 2012)).

[48] *Osborn*, 991 A.2d at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 2010 WL 779992, at *2 (Del. Mar. 8, 2010)).

[49] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.").

[50] Term Sheet 6 ("[T]his Term Sheet shall be governed in all respects by the laws of the Province of Québec and the federal laws of Canada applicable therein.").

[51] *Québec (Agence du revenu) v. Services Environnementaux AES inc.*, [2013] 3 S.C.R. 838, para. 32 (Can.).

[52] *Id.*; *see* Pl.'s Suppl. Br. 6-8 (citing authority and summarizing these principles of law).

is the common intention of the parties, and the *instrumentum*, which is the declared will . . . as expressed by the written documents."[53] "The agreement lies in the common intention, despite the importance—as between the parties and in relation to third parties—of the declaration, oral or written, of that intention."[54] This approach is codified in the Civil Code of Québec: "[t]he common intention of the parties rather than adherence to the literal meaning of the words shall be sought in interpreting a contract."[55]

### B. Whether the LLC Agreement Superseded the Term Sheet

The first question raised in the cross-motions is whether the "binding" provisions of the Term Sheet remain enforceable after the LLC Agreement's execution. Techno-X asserts that the LLC Agreement had no effect on the enforceability of the Term Sheet for two reasons: (1) the LLC Agreement's integration clause is too narrow to encompass the Term Sheet; and (2) the "[b]inding [p]rovisions [of the Term Sheet] cannot have been superseded by the [LLC]

---

[53] Gideon Ng, Rectification of Tax Transactions in Québec: *Québec (Agence du Revenu) v. Services Environnementaux*, 33 EST. TR. & PENSIONS J. 223 (May 2014); *see also Services Environnementaux*, [2013] 3 S.C.R. 838, para. 32 ("In the Québec law of obligations, a distinction is maintained between the '*negotium*' and the '*instrumentum*' . . . to repeat the words used by the Court of Appeal in the cases at bar, that is, between the common intention and the declared will." (citation omitted)).

[54] *Services Environnementaux*, [2013] 3 S.C.R. 838, para. 32.

[55] Civil Code of Québec, S.Q. 1991, c. 64, art. 1425 (Can.); *see also Ihag-Holding, Agv Intrawest Corp.*, [2009] Q.J. No. 5986, paras. 132-33 (Can. Que. C.S.).

Agreement according to their plain terms."[56]  Spartan Forge makes the opposite arguments.[57]

I can determine the integration clause's scope under Delaware law.  But I decline to definitively resolve the effect of the Term Sheet's provisions.[58]  If Québec law applies, I must ascertain the parties' common intent.[59]  The distinction between their intent and the Term Sheet's text may prove one without a difference.[60]  Still, given the potential complexities, I focus my analysis on the LLC Agreement.

A fully integrated, binding contract "discharges prior agreements to the extent that they are within its scope."[61]  "Clauses indicating that the contract is an expression of the parties' final intentions generally create a presumption of

---

[56] Pls.' Opening Br. 15-16.

[57] Defs.' Opening Br. 11-12; *see also* Defs.' Answering Br. 3-5, 8.

[58] In other words, I am not deciding as a matter of law what the parties intended in executing the Term Sheet.  It is unclear whether this issue remains important considering my assessment of the integration clause.

[59] *See supra* notes 51-55 and accompanying text.  Spartan Forge argues that Delaware law applies.  *See* Defs.' Suppl. Br. 6-10.

[60] *See 2758792 Canada inc. v. Bell Distrib. inc.*, [2009] Q.J. No. 7866, para. 91 (Can. Que.) ("[I]t is only when a contract is ambiguous that the court may resort to extrinsic evidence to interpret it."); *see also* Civil Code of Québec, S.Q. 1991, c. 64, art. 1434 (Can.) ("A contract validly formed binds the parties who have entered into it not only as to what they have expressed in it but also as to what is incident to it according to its nature and in conformity with usage, equity or law.").

[61]  Restatement (Second) of Contracts § 213(2) (1981).

integration."[62] Often, an integrated definitive agreement will supersede a term sheet. But like any other contract provision, "[a]n integration clause should be interpreted according to its plain meaning when its terms are unambiguous."[63]

The integration clause in the LLC Agreement states: "This Agreement constitutes the entire agreement between the Members *relating to the subject matter of the [LLC] Agreement*."[64] Spartan Forge asserts that this clause extinguished the Term Sheet.[65] Yet that is only true if the Term Sheet is encompassed by the "subject matter of the [LLC] Agreement."[66]

The key question, then, is whether the "binding" Term Sheet provisions fall within the LLC Agreement's subject matter. If so, the Term Sheet might be

---

[62] *Addy v. Piedmonte*, 2009 WL 707641, at *9 (Del. Ch. Mar. 18, 2009).

[63] *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 823 (Del. Ch. 2020) (quoting *Barton*, 2013 WL 6072249, at *6).

[64] LLC Agreement § 11.10 (emphasis added).

[65] *See* Defs.' Opening Br. 2-4. Spartan Forge asserts that the "binding" provisions of the Term Sheet were extinguished because they were not expressly carved out of the LLC Agreement's integration clause. *Id.* at 12-13. It cites *ev3, Inc. v. Lesh*, where a term sheet with binding and non-binding provisions was explicitly excluded from an integration clause in a merger agreement. *Id.* at 12 (citing *ev3, Inc. v. Lesh*, 114 A.3d 527, 537 (Del. 2014)). But the court in *ev3* did not hold that a carve-out was necessary for the binding provisions of the term sheet to survive, as Spartan Forge suggests. Instead, the court declined to enforce the non-binding provisions of the term sheet, noting that binding provisions are ones that "negotiating parties in the merger and acquisition context often expect to survive." *ev3*, 114 A.3d at 536-37.

[66] LLC Agreement § 11.10.

abrogated since the LLC Agreement did not memorialize its survival.[67]  But if a "binding" Term Sheet provision addresses a subject outside the LLC Agreement, it may survive.[68]

The Court of Chancery's decision in *Finger Lakes Capital Partners, LLC v. Honeoye Lake Acquisition, LLC* explored a similar issue.[69]  There, two asset management firms signed a term sheet outlining their promise to invest in, manage, and scale several portfolio companies.[70]  They formed limited liability companies to act as investment vehicles—each of which was governed by an operating agreement with an integration clause that superseded all prior agreements "with *respect to the subject matter* [of the operating agreement]."[71]  The court held that "[n]one of the operating agreements superseded the provisions of the [t]erm [s]heet."[72]  It

---

[67] *Holsopple*, 241 A.3d at 822-23 ("When a prior agreement and a subsequent agreement *cover the same subject matter* and the subsequent agreement contains an integration clause, the prior agreement needs to be memorialized in the subsequent agreement to survive." (emphasis added)).

[68] *See Brady v. i2 Techs., Inc.*, 2005 WL 3691286, at *3 (Del. Ch. Dec. 14, 2005) (concluding that an advancement provision in an earlier agreement was not extinguished by a subsequent agreement with an integration clause, because the integration clause was limited to the "subject matter" of the subsequent agreement and the subsequent agreement addressed indemnification but not the distinct right of advancement).

[69] 2015 WL 6455367 (Del. Ch. Oct. 26, 2015), *aff'd in relevant part*, 151 A.3d 450 (Del. 2016).

[70] *Id.* at *1-2.

[71] *Id.* at *4-5 (emphasis added).

[72] *Id.* at *18.

differentiated the subject matter of (1) the operating agreement applicable to the parties "in their capacity as members" from (2) the term sheet on the "overarching business deal" through which one party secured capital from the other.[73]

Here, the LLC Agreement governs Spartan Forge's internal affairs, management, and the relationship among Spartan Forge's members.[74] The Term Sheet, by contrast, addresses Techno-X's investment in Spartan Forge.[75] It outlines the relationship between Techno-X as an outside investor and purchaser, on the one hand, and Spartan Forge and its signing members as sellers, on the other hand.[76]

The parties to the LLC Agreement and the Term Sheet are also different. Although the four Term Sheet signatories remained members of Spartan Forge when the LLC Agreement was executed, three new members (in addition to Techno-X)

---

[73] *Id.* at *14, *18.

[74] LLC Agreement, Preamble ("WHEREAS, the Members have accepted an investment in the Company by TECHNO-X USA INC. . . ., and the Members are executing this Agreement to (a) continue the existence of the Company, and (b) amend and restate the Original Operating Agreement as more fully hereinafter set forth.").

[75] By describing the gist of the Term Sheet, I make no finding about the parties' intent related to that contract. *See supra* notes 58-60 and accompanying text.

[76] *See* Term Sheet 1 (explaining that Techno-X would "acquire a significant portion of the company" in exchange for a cash investment); *see also Barton,* 2013 WL 6072249, at *6 (holding that because a signatory to a term sheet was not a member of the subject LLC when the term sheet was executed, the subsequent execution of a fully integrated LLC agreement did not supersede the term sheet).

were added.[77]  The Term Sheet applied to Techno-X as an outside investor; Techno-X was not yet a Spartan Forge member.[78]  But the LLC Agreement pertains to Techno-X in its capacity as a Spartan Forge member.[79]

Most importantly, the LLC Agreement is silent on subjects addressed in "binding" provisions of the Term Sheet.  Techno-X highlights that the Term Sheet imposes an exclusivity obligation on Spartan Forge, so long as Techno-X has not missed any payments during a fifteen-month period.[80]  Under the Term Sheet, the exclusivity obligation is a "binding" provision; the payment structure is not.[81]  The LLC Agreement reflects the fifteen monthly payments, but it lacks an exclusivity obligation similar to the one in the Term Sheet.[82]  Thus, the Term Sheet's exclusivity obligation is outside the LLC Agreement's subject matter.

---

[77] *See* LLC Agreement, Signature Page (adding Blue Progress Forward, John Stewart, and TLT Electric as member signatories).

[78] Term Sheet 1 (listing the parties to the agreement as Spartan Forge's members (which did not include Techno-X), on the one hand, and Techno-X as the "Purchaser" or "Investor," on the other hand).

[79] *See, e.g.*, LLC Agreement, Signature Page (stating that "this Agreement is executed by the Company and the Members").

[80] *See* Pl.'s Opening Br. 15-16 (citing Term Sheet 4 ("Exclusivity; Restriction on Business")).

[81] Term Sheet 6.

[82] *See* LLC Agreement § 4.3; *see also id.* at Sched. A n.2.

Spartan Forge's motion for summary judgment is therefore denied insofar as the integration clause did not extinguish "binding" provisions of the Term Sheet that address issues beyond the LLC Agreement's specific subject matter. This aspect of Techno-X's motion is correspondingly granted. The effect of the surviving Term Sheet provisions remains to be resolved.[83]

### C. Whether the Purported Amendments to the LLC Agreement Are Effective

The second question presented is whether the LLC Agreement was validly amended by the actions taken at the February 11 member meeting. Techno-X argues that the Managing Member is vested with the exclusive authority to amend the LLC Agreement, limited by Techno-X's veto right.[84] Spartan Forge, however, insists that its members have the authority to unilaterally amend the LLC Agreement.[85] The LLC Agreement's plain terms support Techno-X's position.[86]

The Managing Member has the "full responsibility for management of the business and affairs of the [Spartan Forge],"[87] subject to certain consent

---

[83] *See supra* notes 58-60 and accompanying text.

[84] Pl.'s Opening Br. 18.

[85] Defs.' Opening Br. 19.

[86] LLC Agreement §§ 8.1(a), 8.2(b), 8.6.

[87] *Id.* § 8.1(a) ("Except as otherwise expressly provided in this Agreement, the Members hereby agree that full responsibility for management of the business and affairs of the Company shall be delegated to the Managing Member . . . .").

requirements. Section 8.2(a) of the LLC Agreement lists actions the Managing Member cannot take without the prior consent of the "Majority in Interest of the Members" or the Board.[88] Section 8.2(b) outlines additional major decisions that require Techno-X's consent.[89] Among them is "[a]mend[ing] the [LLC] Agreement, except as otherwise expressly provided in th[e] [LLC] Agreement."[90]

These provisions, read together, require that any amendment to the LLC Agreement be made (1) by the Managing Member and (2) with the consent of Techno-X, plus the Board and a majority of the members. Neither requirement was satisfied. At the February 11 meeting, Spartan Forge's members—not its Managing Member—purported to amend Section 8.2(a) and (b) of the LLC Agreement.[91] The

---

[88] *See supra* note 16 (defining these terms).

[89] LLC Agreement § 8.2(b) (listing actions the Managing Member cannot take without the prior consent of (1) a Majority in Interest of the Members, (2) the Board, and (3) Techno-X).

　　Spartan Forge argues that the phrase "except as otherwise provided in t[he] [LLC] Agreement" is a carve-out from the Managing Member's authority over amendments. *See* Defs.' Opening Br. 22-24; Defs.' Answering Br. 16. That clause can only logically be read as a reference to other portions of the LLC Agreement that authorize the Managing Member to make amendments without additional consents. *See, e.g.*, LLC Agreement §§ 4.4 (granting the Managing Member authority to amend Schedule A to the LLC Agreement unilaterally to reflect changes in unit ownership), 8.1(b)(ii) (empowering a successor Managing Member to amend the LLC Agreement to reflect the replacement of the Managing Member "without any further action, approval or vote").

[90] LLC Agreement § 8.2(b)(vii).

[91] Defs.' Ex. G at 2-3.

Managing Member did not even attend; he recused himself.[92]   And Techno-X

refused to consent.[93]  The LLC Agreement was therefore not properly amended.

Spartan Forge insists otherwise.  Its argument centers on Section 11.10 of the

LLC Agreement, which states:

> Any amendment or modification to th[e] [LLC] Agreement may be made with the consent of a Majority in Interest of the Members; provided, however, that no amendment may be made to Sections 6.1, 6.2 or 6.3 of th[e] [LLC] Agreement without the consent of the Member if the amendment would have a material adverse effect on the Member's right to receive distributions from [Spartan Forge].[94]

According to Spartan Forge, this provision permits a majority of the members to

unilaterally amend the LLC Agreement if the amendment is not of Sections 6.1, 6.2,

or 6.3.[95]

That interpretation collides with the LLC Agreement as a whole.  Spartan

Forge's members agreed to vest exclusive managerial power in the Managing

Member and to divest themselves of authority over Spartan Forge's affairs.[96]

Section 8.6, titled "Limitations on Actions of Members," states:

---

[92] *See* Defs.' Ex. F.

[93] Defs.' Ex. H at 6 (reflecting that Techno-X objected to and abstained from the vote).

[94] LLC Agreement § 11.10.

[95] Defs.' Opening Br. 20-21.

[96] LLC Agreement §§ 8.1(a), 8.6.

> No Member except the Managing Member may take any action on behalf of, or in the name of, [Spartan Forge], or enter into any contract, agreement, commitment or obligation binding upon [Spartan Forge], or, in his capacity as a Member of [Spartan Forge], perform any act in any way relating to [Spartan Forge] or [Spartan Forge's] assets.[97]

As noted above, the Managing Member's authority is limited by the consent rights in Section 8.2(a) and 8.2(b). Section 11.10 does not upset this structure and grant non-managing members unilateral authority to take actions the LLC Agreement elsewhere prohibits.

Instead, Section 11.10 allows non-managing members to consent to an amendment of the LLC Agreement.[98] The amendment "may be *made with* the consent" of a "Majority in Interest of the Members."[99] But the amendment *must* be "made" by the Managing Member—with not only the consent of a majority of

---

[97] *Id.* § 8.6.

[98] Spartan Forge makes a string of arguments about why it believes the amendments were validly adopted. *See, e.g.*, Defs.' Opening Br. 23-24 (arguing that the "specific controls the general"); *id.* at 28-29 (arguing that "equity protects rather than constrains non-managing members in the exercise of their voting rights"); Defs.' Answering Br. 9-10 (suggesting that Section 8.3 recognizes the "parallel procedural track[]" provided by Section 11.10). All stem from reading Section 11.10 as a grant of authority to the members. Because that reading lacks support in the LLC Agreement, each argument fails.

[99] LLC Agreement § 11.10 (emphasis added).

members, but also that of Techno-X.[100]  Those consent rights are not tantamount to unilateral authority.[101]

## III.    CONCLUSION

The integration clause of the LLC Agreement did not conclusively eliminate the Term Sheet, insofar as "binding" Term Sheet provisions fall outside the LLC Agreement's specific subject matter.  Techno-X's motion is granted in this respect; Spartan Forge's cross-motion on this issue is denied.  Whether the provisions of the Term Sheet labeled "binding" remain effective by their terms cannot presently be resolved as a matter of law.

The purported amendments to the LLC Agreement addressed at the February 11 member meeting are ineffective.  Techno-X's motion is granted in this respect; Spartan Forge's cross-motion on this issue is denied.

Sincerely yours,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor

---

[100] *Id.* § 8.2(b).

[101] *See 2009 Caiola Fam. Tr. v. PWA, LLC*, 2014 WL 1813174, at *8-9 (Del. Ch. Apr. 30, 2014) (explaining that a non-managing members' consent right did not "wrest initial decision-making authority from the Managing Member" or "give the Non–Managing Members the authority to initiate any of the enumerated actions unilaterally"); *McMillan v. Nelson*, 2024 WL 3311812, at *9 (Del. Ch. July 5, 2024) (holding that a term granting members consent rights did not give them power to unilaterally direct the company where the managing member had exclusive "authority to act for or bind the [c]ompany").